Karl E. STIEGELE, and Speidel Corporation, Plaintiffs,

v.

J. M. MOORE IMPORT-EXPORT CO., Inc., Moore Products Corporation and Joseph Mitchell Moore, Defendants.

United States District Court
S. D. New York.
April 30, 1962.

Harry R. Pugh, Jr., New York City, for plaintiffs. Dike, Thompson, Bronstein & Mrose, Boston, Mass. (Robert L. Thompson) and Goodwin, Proctor & Hoar, Boston, Mass. (Frank B. Wallis), Boston, Mass., of counsel.

Morgan, Finnegan, Durham & Pine, New York City, for defendants. Granville M. Pine and Thomas P. Dowling, New York City, of counsel.

METZNER, District Judge.

This is an action for patent infringement. The patent was issued on September 21st, 1954 (No. 2,689,450) to plaintiff Karl Stiegele for an expansible bracelet. Plaintiff Speidel Corporation

has an exclusive license to the patent and has been engaged in the manufacture and sale of expansible watch bracelets since 1932.

Defendant Joseph Moore has imported watch bracelets from Japan under the firm name J. M. Moore Import-Export Co. This firm was incorporated by Moore in 1953. Later that same year he formed Moore Products Corporation. Import-Export sold the bracelets to Products, which in turn resold them to distributors in the United States. In 1960 Import-Export was dissolved and Products now buys its requirements directly from Japan. Moore owns all the stock of both corporations and is their president.

The main defenses are invalidity of the patent and noninfringement.

The patent concerns itself with the arrangement of only three elements to achieve an expansible bracelet. One is a hollow link of much greater length than width, the length lying parallel to the length of the wearer's arm. The second is a leaf spring bent downward from the center with the ends turned sharply downward and then upward to form a groove or notch. The third is a U-shaped connector with the legs being grooved or notched on the inside and the legs being wider than they are thick. The bracelet is formed by two rows of overlapping, staggered links. Each link has a leaf spring inserted inside it and extending the full length of the link. Each top link has inserted in one open end between the top of the link and the top of the spring one leg of two different connectors. It similarly has inserted in the opposite open end of the link one leg of two other connectors. The other leg of the two opposing connectors is inserted in the opposite open ends in the bottom link that lies to the *right* of the top link. The leg fits in between the bottom of the link and the bottom of the leaf spring. The legs of the other two opposing connectors are similarly inserted in the bottom link that lies to the *left* of the top link. A band may thus be formed of any desired length, depending on the number of links used. It is ex-

pansible and contractible by reason of the interaction between the spring, the leg of the connectors and the walls of the links when the ends of the band are pulled apart and released. Not only can the band be flexed laterally, but also vertically, with the result that the whole band has a twisting flexibility. One of the methods used to advertise the product is to tie the band in a knot to show its flexibility.

The proof shows that for years the industry has been using expansible bracelets of various designs, all of which have presented problems due to the stresses placed upon them in use. In the main, some form of permanent connection was used to connect the parts. The bands only had lateral flexion, but since they were also subject to vertical stresses when placed upon the wrist and removed therefrom, weaknesses developed and the band could break at the connecting points. Even those which utilized a coil spring arrangement were subject to the same limitations.

The method evolved by Stiegele to make the band was a new and novel combination. It used only three elements. There was no permanent connection between the members so that a form of floating action resulted. The bracelets based on this patent were cheaper to produce, more durable, made adjustment of length easy at the source of retail purchase, reduced cost of repairs and achieved great commercial acceptance. Making a bracelet according to the specifications and claims in the patent would not be obvious to a person having ordinary skill in the art. The Mason patent and the Thornton patent do not anticipate or make obvious the Stiegele patent.

Defendants have raised a question whether the claims in issue here (claims 1, 2, and 5 through 9) create a product that is useful, and if so whether it is not limited to a specific construction. I have made reference to the fact that the ends of the leaf spring are notched as well as the interior of the legs of the connector. This is indicated both in the drawings (figure 5 at 13 and figure 6

320

at 17, 18) and the specifications (column 3, lines 38–43, 58–64). The specifications state that this construction allows the ends of the springs to fit into the notch in the connectors to "anchor the connector to the links." The claims in suit do not refer to this "anchoring" feature, although it is mentioned in other claims. Rather, the claims under consideration speak of the leaf spring "engaging" the leg of the connector for "urging and wedging" the leg against the wall of the link.

The argument is made that the product will not work absent from the claims in suit the anchoring means of holding the connectors within the links. Therefore, you must refer to the drawings and specifications to ascertain the means for holding the parts in assembled relationship. Since the anchoring means are found there, only such means are available to the plaintiffs, and in any event a reasonable interpretation of the words "engaging," "urging" and "wedging" requires such a device.

Admittedly, the articles alleged to infringe do not use the anchor method of holding the parts together. The first article that is claimed to infringe is known as "Deal # 777," as exemplified by plaintiffs' exhibit 5. Neither the leaf spring nor the connector has notches. The connector is positioned between the end of the spring and the upper wall of the top link. This upper wall has a flange on both ends which is bent over the tops of the connectors and keeps them in place.

The second article, referred to as the "Fortex Mor-Flex," exemplified by plaintiffs' exhibit 14, has the flange on the bottom wall of the bottom link which is turned up to hold the connectors in place.

The third product which is claimed to infringe is known as the "Lamp Bracelet," as exemplified by plaintiffs' exhibits 16 and 51. Flanges are not used to hold the connectors in place, and instead of four connectors only two are used because a different shape of connector has been devised. Each connector is in the shape of an incomplete rectangle since a portion of one side is open. Thus, the connector starts just inside the bottom link, goes through the opening and up to the opening in the top link, then along the inside of the top link to the opposite end and down to the opening of the bottom link and inside that link for a short distance.

On the other hand, while Speidel originally used the anchor construction in its "Kingsway Bracelet" (plaintiffs' exhibit 63), it changed to the type of construction of the "Deal # 777" in its current style known as the "Twist-O-Flex" (plaintiffs' exhibit 64).

The anchor method of holding the connectors within the links is not necessary to the operation of the invention. It will work just by the pressure of an unnotched spring on an unnotched connector leg. However, it could not stand the abuse that it would be subject to in everyday wear. Some means are necessary to hold the parts together for such use and they are obvious to anyone skilled in the art. That has been demonstrated in the various articles just described. However, this patent teaches the interaction of the spring on the connectors and the inside walls of the links to gain twisting flexibility and the other advantages already adverted to. It is this principle which is found in the accused articles. Any means for holding will suffice to assure long wear and variance from that indicated in the patent will not escape infringement.

It is also claimed that the Stiegele structure is inoperative for failure to define the relationship among the elements necessary to prevent the overtravel of the bracelet. This means that when the bracelet is extended the leg of the connector can so turn on its longitudinal axis past a point that upon release of the tension the spring will be unable to force it back into retracted position. I do not find this to be true. The connector is defined as having a leg of greater width than thickness. The relationship is sufficiently defined in the claims when read in the light of the specifications (column 4, lines 16–53), and any person versed in the art could

manufacture an operable product from this patent.

I find from the proof submitted that plaintiffs have a valid patent and that defendants have sold articles which infringe that patent. Submit findings of fact and conclusions of law.

So ordered.